UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                          :
STEVEN SALSBERG, ESQ. and GLORIA              :
SALSBERG,                                                 :
                                                          :      07 Civ. 8422 (DLC)
                        Plaintiffs/Appellants,    :
                                                          :
    - against -                                           :
                                                          :
TRICO MARINE SERVICES, INC., TRICO           :
MARINE ASSETS, INC., TRICO MARINE           :
OPERATORS, INC., and TRICO MARINE          :
INTERNATIONAL, INC.,                               :
                                                          :
                        Defendants/Appellees.    :
-----------------------------------------------------------------------X


CORRECTED APPELLANTS' REPLY BRIEF


STEVEN SALSBERG, Esq., pro se          LAW OFFICE OF JOSEPH P. GARLAND
        Steven Salsberg                            Joseph P. Garland – JG0888
   205 W. 88th Street, #2-D                    275 Madison Avenue, Suite 420
      New York, NY 10024                          New York, NY  10016
        (212) 362-1367                                 (212) 213-1812

                                                       Attorneys for Gloria Salsberg

**Table of Contents**

I.  Argument ........................................................................................................... 1

    A.  The Bankruptcy Court erred, as a matter of law, in finding that Mr. Turbidy did not lie .. 1

    B.  Trico makes numerous errors in its description of the facts ................................................. 3

    C.  Proof of Fraud and the Scienter Issue ............................................................. 13

        1. Fraud Under New York Law ...................................................................... 13

        2. Constructive Fraud, Applying New York Law .......................................... 14

        3. Actual Fraud, Applying New York Law .................................................... 15

        4. Fraud Applying Federal Law Under 11 U.S.C. § 1144 ............................... 16

        5. Fraud on the Court and FRCP 60(b) ......................................................... 18

    D.  The fraud here was "severe" .......................................................................... 21

    E.  Plaintiffs are not raising a new issue................................................................. 21

    F.  Mr. Salsberg did not have an opportunity to uncover the fraud ........................................ 22

    G.  Plaintiffs' Complaint Sufficiently Alleged that an Officer of the Court Committed the Fraud ...................................................................................................... 23

    H.  This is not a case where the Court needs to be concerned about "Redividing the Pie".... 24

    I.  Trico and the Bankruptcy Court made numerous errors with respect to valuation ......... 26

    J.  The Relevance and Merit of Plaintiff's Argument Regarding Trico's Net Operating Loss ("NOL") Valuation ....................................................................................... 29

II.  Conclusion ........................................................................................................ 31

## Table of Authorities

**Statutes and Rules**

11 U.S.C. § 1125 ........................................................................................................ 17

11 U.S.C. § 1129 ..................................................................................................... 8, 14

11 U.S.C. § 1144 .................................................................................................. passim

Fed. R. Civ. P. 60(b) ............................................................................................. 18, 19

**Cases**

*Abbate v. Abbate*, 82 A.D.2d 368, 441 N.Y.S.2d 506 (2d Dep't 1981) ........................................ 14

*Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.*, 569 F.2d 181 (2d Cir. 1977) ................. 16

*Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993) ................................................... 19

Franco-Hellenique de Commerce v. Christophides, 106 F.3d 22 (2d Cir. 1997) ........................ 15

*Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 122, 629 N.Y.S.2d 1009, 1014, 653 N.E.2d 1179, 1184 (1995) ................................................................. 15

*Hotel Corporation of the South v. Rampart 920, Inc.*, 46 B.R. 758 (E.D. La. 1985), *affd w/o op.*, 781 F.2d 901 (5th Cir. 1986). ........................................................................ 24

*In re California Litfunding*, 360 B.R. 310 (Bankr. C.D. Cal. 2007) ........................................ 22, 25

*In re Coffee Cupboard, Inc.* 119 B.R. 14 (E.D.N.Y. 1990) .......................................................... 25

*In re Genesis Health Ventures, Inc.*, 324 B.R. 510 (Bankr. D. Del. 2005), *aff'd*, 340 B.R. 729 (D. Del. 2006) ........................................................................................................ 24

*In re Michelson*, 141 B.R. 715 (Bankr. E.D. Cal. 1992) ........................................................ 20

*In re Newport Harbor Assocs.*, 589 F.2d 20 (1st Cir. 1978) ...................................................... 25

In re Tenn-Fla Partners, 226 F.3d 746 (6th Cir. 2000) ................................................... 17

In re Tenn-Fla Partners, 229 B.R. 720 (W.D. Tenn. 1999) ................................................... 17, 18

*Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y. 112, 302 N.Y.S.2d 799 (N.Y. 1969) ........ 15

*Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072 (2d Cir. 1972)................... 20

*Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir. 1973) ................................................................ 21

*Oleck v. Fischer*, 623 F.2d 791 (2d Cir. 1980) .......................................................................... 21

*Phelps & Co. v. Circle K Corp.* (*In re Circle K Corp.*)171 B.R. 666 (Bankr. D. Ariz. 1994) ..... 25

*Pitcher v Sutton*, 238 A.D. 291, 264 N.Y.S.2d 488 (4th Dep't 1933), *aff'd,* 264 N.Y. 638 (1934) ............................................................................................................................................ 14

*Robinson v. Audi Aktiengesellschaft*, 56 F.3d 1259 (10th Cir. 1995).......................................... 20

*S.E.C. v. Platinum Investment Corp.*, 2006 WL 2707319 (S.D.N.Y. Sept. 20, 2006).................... 2

*State Street Trust Co. v. Ernst*, 278 N.Y. 104, 15 N.E.2d 416 (1938)........................................... 2

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ................. 15

*United States v Lombardozzi,* 491 F.3d 61 (2d Cir. 2007) .......................................................... 20

*United States v. Nicholson*, 677 F.2d 706 (9th Cir. 1982) .......................................................... 16

*Wyle v. R.J. Reynolds Indus.*, 709 F.2d 585 (9th Cir. 1983)....................................................... 16

Plaintiffs/Appellants Steven Salsberg, Esq., and Gloria Salsberg respectfully submit this Reply Brief.

# I.     <u>ARGUMENT</u>

## A.     The Bankruptcy Court erred, as a matter of law, in finding that Mr. Turbidy did not lie

In their opening brief, Plaintiffs showed that when he testified at the January 19, 2005 Confirmation Hearing, Trevor Turbidy, Trico Marine's chief financial officer at the time, knew that Trico's performance in the fourth quarter of 2004 –in terms of revenue or EBITDA – was some 33% higher than what Trico projected in its disclosure statement.  Trico does not challenge what Mr. Turbidy knew or that the actual performance of those metrics was 33% higher.

Trico acknowledges that Mr. Turbidy testimony was that the Fourth Quarter was "'fairly consistent' with [the] projections, but it 'wasn't spot-on, dollar for dollar,' and was 'slightly' but 'not materially' higher than projected."  (Trico Br., at 15 (quoting Confirmation Hearing ("CH") Tr., at 122-123.)  But Trico insists that this testimony "makes sense when viewed in light of Trico's financial situation at the time of the Confirmation Hearing."  (Trico Br., at 15.)

> The Bankruptcy Court therefore properly held that Mr. Turbidy's Confirmation Hearing testimony accurately contextualized Trico's Q4 performance against the larger picture of Trico's dire financial position.

(Trico Br., at 16.)

In their opening Brief, Plaintiffs quoted the actual testimony, with the colloquies that interrupted it.  That material shows, as a matter of law, that the bankruptcy court erred when it "contextualized" or, worse, allowed Mr. Turbidy to "contextualize" the actual testimony about the simple proposition of *how did Trico perform in the Fourth Quarter as compared to how Trico projected it would perform in the Fourth Quarter in the Disclosure Statement* into some broader issue.

Putting aside the contextual argument, Trico pursue the argument that a 33% spread is "consistent" with and "slightly" and "not materially" different. (Trico Br., at 18-19.) The SEC deems any difference of 5% between a reported figure in a company's financial reporting and a corrected one "material" and thus requiring public correction so as not to be misleading. (*See* PX 47.) But one doesn't need the SEC to know that this is absurd. So the distinguishing factor between this case and *S.E.C. v. Platinum Investment Corp.*, 2006 WL 2707319 (S.D.N.Y. Sept. 20, 2006), is simply Trico's refusal to acknowledge the falsity of the information. The information was false.

Similarly distinguishable are the cases in Plaintiffs' Brief that are discussed in Trico's note 9. Those cases addressed situations in which a witness knew information that called into question the truthfulness of testimony or other statements. Thus, the New York Court of Appeals in *State Street Trust Co. v. Ernst* said fraud can exist when someone says something is true "when knowledge there is none." 278 N.Y. 104, 112 (1938). Here, by contrast, we have the CFO being asked how his company performed during a discrete period of time for a discrete financial item – even granting "confusion" about whether the ultimate questions went to revenue or EBITDA – admitting that he knew that the difference was 33%, and insisting that he was not lying when he said it. That his testimony was false is the core of this case, and the Bankruptcy Court's failure to acknowledge this was clearly erroneous. It is not a question of what he knew at the time. That was amply documents and thus admitted by Trico. There was no credibility assessment on that front.

As noted in Plaintiffs' opening Brief, the trial was for a limited purpose: did Mr. Turbidy lie? Whether it affected the bankruptcy court's decision to confirm the plan of reorganization was for another day. Yet Trico argues that one quarter was meaningless on the question of its financial prospects. (Trico Br., at 20.) What would have happened if Mr. Turbidy said the truth.

2

Although it is for another day, as we say, it was not for Mr. Turbidy to decide for himself as he testified at the Confirmation Hearing that it was for him to connect the dots and dismiss the actual-vs.-projected performance as meaningless in the big picture.

**B.    Trico makes numerous errors in its description of the facts**

In its description of the facts, Trico makes numerous mischaracterizations.

*1.* Contrary to Trico's mischaracterization, Mr. Salsberg denied "that Mr. Turbidy's testimony at the Confirmation Hearing was 'not clearly about revenue.'" (Trico Br., at 14; compare to Trial Tr. at 169-170.)  Similarly, the assertion that Mr. Turbidy's explanation that the difference in Trico's actual EBITDA, as compared to the projections, was a "drop in a bucket," (Trico Br., at 15), is not what "Appellants recognize." (Trico Br. at 15; compare Pl. Br., at 16.)

*2.* Plaintiffs, in fact, alleged that an officer of the court misled the Bankruptcy Court at the Confirmation Hearing.  (*See* SAC at 1 (alleging that Mr. Turbidy, Trico's then CFO, had misstated Debtors' performance.)  Since Trico was a debtor in possession, Mr. Turbidy, as Trico's officer, was an "officer of the court" when he testified at the Confirmation Hearing.

*3.* Trico asserts that EBITDA for the 2004 Q4 through November 30, 2004 was approximately $5.3 million.  (Trico Br., at 14-15.)  Mr. Turbidy, however, said (and the Bankruptcy Court acknowledged) that EBITDA for the same period was $5.6 million.  (Trial Tr. at 33, 44, and 62; see also PX 6, at TRM10881.)  More importantly, the reference to EBITDA of $5.3 million that Trico makes, (*see* PX 6, at TRM10871), is not a comparable statistic, as compared to the Financial Projections.

*4.* Asserting that Trico had "'bleak financial prospects'" and was "'hopelessly insolvent,'" Trico cites the Bankruptcy Court's findings.  (Trico Br., at 15-16 (quoting and citing the Dec., at 16 and 17 and the CH Tr., 137:3), and 19.)  But Trico was in the midst of a major recovery from its bottom of a year earlier.  (DS at I-6, Part II.A.2.; see also PX 48, at 78.)  The Bank-

ruptcy Court and Trico ignored numerous indications that Trico was in the early stages of a major recovery.  (1) Trico's revenue (the driving force behind Trico's EBITDA because "between 70% and 80% of any additional revenue would go 'straight down to EBITDA,'" (Dec., at 7-8), had grown throughout 2004, since Q1, at almost 13% *per quarter*, (see PX 48, at 78; see also Figures 1 and 2, *infra*), as opposed to only 5.7% for the year from 2004 to 2005 in the projections; (2) Trico experienced "dramatically higher" revenue (as opposed to the projections) in each month of the Fourth Quarter; (3) Trico expected revenue to continue growing into 2005 Q1 (See PX 13, at TRM10784.); (4) Trico had below market fixed-rate contracts that were due to expire throughout the upcoming two years (which would increase revenue even more) (See PX 49, at 59-60, and also 27, 40, and 54; see also Pl. Br., at 9.)

**Figure 1**

| ($millions) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | '04-Q1 | '04-Q2 | '04-Q3 | '04-Q4 | '05-Q1 | '05-Q2 | '05-Q3 | '05-Q4 | '06-Q1 | '06-Q2 | '06-Q3 | '06-Q4 |
| Revenue (actual) | 23.6 | 25.7 | 29.5 | 33.7 | 38.1 | 43.2 | 47.1 | 53.9 | 51.8 | 61.5 | 68.5 | 66.9 |
| EBITDA (actual) | 1.9 | 2.2 | 5.5 | 5.4 | 11.9 | 15.1 | 21.0 | 23.5 | 24.9 | 25.7 | 33.2 | 30.8 |
| Trailing 4 Qtr Revenue (actual) | | | | 112.5 | 127.0 | 144.4 | 162.1 | 182.3 | 196.0 | 214.3 | 235.7 | 248.7 |
| Trailing 4 Qtr EBITDA (actual) | | | | 15.0 | 25.0 | 37.9 | 53.5 | 71.6 | 84.6 | 95.2 | 107.3 | 114.6 |
| Trailing 4 Qtr Projected Revenue | | | | 103.7 | | | | 109.2 | | | | 126.2 |
| Trailing 4 Qtr Projected EBITDA | | | | 13.6 | | | | 23.9 | | | | 38.0 |

(*See* PXs 40, generally, 48 at 21, 78, and generally, 49 at 27, 84, and generally, and 55 at 21, 26, 29, 48, 85 and generally.)

    *5.* Defendants mischaracterize Plaintiffs' argument regarding the unusually large special charges as creating a "hybrid EBITDA" as a "meaningless number." (Trico Br., at 16-17.)  Had Mr. Turbidy disclosed that his Confirmation Hearing testimony was dependent upon those charges – that were not in the projections (*see* PX 9, at TRM10835-836, and 838) and that Trico had substantially higher revenue (compared to the projections) in the 2004 Q4 and was expecting substantially higher revenue in January 2005 (*see* PX 13, at TRM10784), then the Bankruptcy

Court would have seen that the Financial Projections –used by Lazard in the valuation – were unreasonably low.  Trico argues and the Bankruptcy Court analyzed and decided based on the false premise that Trico's valuation model is based on "last year's" performance:

> "[A]n increase of $2.7 million in fourth quarter EBITDA would have been insufficient to cover the $9 million quarterly interest expense or the $19 million annual shortfall in the interest expense on the Senior Notes, and there is no evidence that it would have made a dent in the over $200 million in negative equity."

(Trico Br., at 21 (quoting Dec., at 20); *see also* Trico Br., at 22, n.11.)  (Such statement by the Bankruptcy Court is faulty because Trico's ability to pay for its interest expense and its value, are based upon its future performance and not its past difficulties and because there was *substantial* evidence that would more than make a "dent" in the Lazard opinion that Trico had *$164.8 million* of "negative equity.")

No one disputes that Trico had a rough 2003-04, particularly early 2004.  With full disclosure (the actual 2004 Q4 performance and additional information regarding Trico's condition going into 2005, particularly considering that Trico had been climbing steadily out of the "cellar" since the 2004 Q1) showed at least a *material possibility* that Trico's *prospects* were substantially improved.  Trico's operating shortfalls were behind it and its prospects were much better than the projections indicated.  Trico claims that Plaintiffs "ignore … the actual results for the first three quarters of 2004 [and therefore Plaintiffs'] calculations are meaningless."  (Trico Br., at 21.)  Trico's performance in 2004 was historical, as of the Confirmation Hearing – valuation models are based on *future prospects*.  The Lazard/NeJame valuation model did not calculate Trico's value based on the 2004 performance statistics – Lazard "applied a range of multiples to [Trico's] estimated *2005* EBITDA to determine a range of Enterprise Values" in their "Comparable Company Analysis" valuation (see DS at I-45, Part VIII.D.2.a.), and for Lazard's "Discounted Cash Flow ("DCF") analysis value[d] [Trico] by determining the current value [as of December 31, 2004] of estimated *future* cash flows to be generated by [Trico which were] dis-

5

counted by the [Trico's] weighted average cost of capital."  (DS at I-46, Part VIII.D.2.b.) (Emphasis added.)  The empirical evidence shows that the projections were unreasonably low, Trico's revenue and EBITDA grew substantially faster than depicted in the projections, and that EBITDA in every quarter after 2004 Q4 substantially exceeded its pre-reorganization interest expense of approximately $8 million per quarter.  (See Figure 1.)

   *6.* Defendants claim that only the $2.7 million UK pension charge (and not the $1.5 million Inventory Reserve and the $.7 million Redundancy Reserve) was not in the projections.  (Trico Br. at 17, n.8.)  However, "[o]perating expenses were dramatically higher than the *model* due to special charges for the UK pension plan ($2.7 million), an adjustment to the redundancy (severance) reserve in the UK ($0.7 million) and an inventory reserve ($1.5 million)."  (PX 9, at TRM10835; see also TRM10836 and 838 (emphasis added).)  The Bankruptcy Court made a related error.  (Dec., at 19-20.)  Since Mr. Turbidy had testified that he, with a team he headed, prepared the projections, (CH Tr. 123:13-17), and since these "special charges" were *not* in the model, he knew, or at least should have known, that such charges were not in the model.  Most important, Mr. Turbidy didn't really know how big these special charges were going to be when he testified at the Confirmation Hearing.  (Trial Tr., at 75 line 7-22.)  But he did know that revenue was going to be more than $8 million (approximately one-third) higher than projected revenue for the 2004 Q4.

   Thus, to the extent that he knew or didn't know how much the special charges would be, he knew there was a major inconsistency with the projections that should have been disclosed when he made the comparison of actual (whether revenue or EBITDA) with the projections and said "it was fairly consistent," "it was slightly higher," and it was "not materially" better/higher.

   *7.* Trico argues that Plaintiffs "miss[] the point" in claiming that Mr. Turbidy was at least reckless.  (Trico Br., at 17.)  Mr. Turbidy did not really know how much the 2004 Q4 EBITDA

6

when he testified at the Confirmation Hearing – even a preliminary number – and he failed to disclose the "dramatically higher" revenue, the unusually large special charges, and several other critical facts when he testified and misled the Bankruptcy Court.  Mr. Turbidy testified at the Trial that he didn't know "at that time" how much the UK pension charge would be, that other unusually large special charges were included on top of the UK pension charge, and that he knew that the "range of possibilities of what it could have been . . . varied very widely *at that point*" in time, "nor was the number for the [UK pension charge] final."  (Trial Tr., at 75 line 7-22 (emphasis added).)  Mr. Turbidy testified at the Trial that he wasn't "sure of how significant an adjustment it would be" to EBITDA.  (Trial Tr., at 75 line 19-22.)  Mr. Turbidy testified at the Trial that he didn't know how much EBITDA was when he testified at the Confirmation Hearing.  (Trial Tr., at 75 line 7-22.)  Mr. Turbidy equivocates with varying notions of the truth regarding what he testified to and why.  (See Plaintiffs' Am. Proposed FOF, at ¶¶ 128-145.)  Mr. Turbidy was obviously at least reckless when he testified.

*8.* Plaintiffs do not claim conspiracy or that Trico did not need to reorganize.  (*See* Trico Br., at 19.)  Rather, Mr. Turbidy knowingly and recklessly provided the Bankruptcy Court with misleading testimony while omitting material information during such testimony.  Had it received full disclosure, the Bankruptcy Court would have learned that the projections that the Lazard/NeJame valuation and testimony relied upon were unreasonably low and that the valuation was thus unsupported, (CH Tr., at 83:23 through 85:4 (NeJame testifying at the Confirmation Hearing that (a) they estimated that the value of Trico's New C/S was $110 million, as of the date of their analysis in late October, early November, 2004; (b) they did not update their analysis "at all" since then, and therefore, since he hadn't "conducted an analysis today based on all the facts and circumstances today[, so he couldn't] answer that question;" and that (c) "Lots of things [had] changed" so to determine Trico's value as of the Confirmation Hearing, he'd have to

7

"reconstitute and conduct an analysis").)  Had Trico and Mr. Turbidy provided full disclosure, Trico would not have been able to prove at the Confirmation Hearing that the Plan was "fair and equitable" and Salsberg could have put on a more complete case.  (*See* 11 U.S.C. § 1129.)

**9.** Trico quotes NeJame's testimony at the Confirmation Hearing regarding the significance of Trico outperforming the projections.  (Trico Br., at 8 (quoting from the CH at 105), and 20 (same).)  Trico ignores NeJame's next two sentences: "I think there is a substantial amount of recovery forecasted. It's not forecasted tomorrow unfortunately for equity holders."  (CH at 105:10-12.)  But Trico was experiencing "a substantial amount of recovery" *not tomorrow, by that very day* (and even in the prior quarter notwithstanding the unusually large special charges).

The day was January 19, 2005 and the projections had revenue and EBITDA peaking in 2008 at $163.5 million and $62.7 million, respectively, then leveling off in 2009 at $154.5 million and $49.8 million, respectively.  (DS at Exhibit C, at 7 (Projected Statements of Operations (Unaudited)); see also Figure 1.)  That very year, 2005, Trico surpassed both of those amounts with revenue of $182.3 million and EBITDA of $71.6 million.  (*See* PX 49 at 27.)  Had Mr. Turbidy and Trico provided full disclosure, many signs were available to show that Trico was on such a vibrant path and to show that NeJame's own testimony coupled with the undisclosed information would have provided the credible basis to show that his and Lazard's valuation was stale and that Trico's value was materially higher.  The undisclosed items included all that was known about the 2004Q4 and 2005Q1 revenue, the unusually large special charges, that Turbidy's knowledge of (and to the extent his testimony was based on) EBITDA was limited by what he knew about the "special charges" and the higher market rates in Trico's fixed-charter-rate markets that was dampening revenue until such fixed-charter-rate contracts would expire.  Referring to Trico, NeJame said: "If you generated a lot more revenue and it was profitable revenue and you were generating it today you could argue that the company is more valuable – more

8

earnings usually means [] more value." (CH Tr. 100:20-23.)

*10.* Trico mischaracterizes the significance of the 2004 Q4 financial performance infor-

mation. (Trico Br., at 20.) The 2004 Q4 does not stand on its own. It is the third data point –

the third consecutive quarter of substantial growth – far in excess of the growth depicted in the

projections – which did establish a trend, and which ultimately continued at least for another

eight quarters through the end of 2006. (*See* PXs 48 at 78, 49 at 84, and 55 at 85; see also Fig-

ures 1, *supra*, and 2, *infra*.) And, Turbidy was aware when he testified at the Confirmation Hear-

ing that the 2005 Q1 was also headed towards robust growth over the 2004 Q4 (See PX 13, at

TRM10784.) – and much higher growth than had been depicted in the projections. (See DS, Ex-

hibit C, at 7 (Projected Statements of Operations (Unaudited)).) Quarter-over-Quarter revenue

growth ranged between 9.2% to 14.5%, per quarter (compounded quarterly). (*See* PXs 48 at 78,

49 at 84, and 55 at 85; see also Figures 1, *supra*, and 2, *infra*.) Yet, the projections depicted *an-

nual* revenue growth at only 5.3%, from 2004 to 2005, and 15.6%, from 2005 to 2006. (DS at

Exhibit C, at 7 (Projected Statements of Operations (Unaudited)); see also Figure 1, *supra*.) And

the significance of the higher revenue is compounded in terms of growth because of Trico's high

operating leverage – "between 70% and 80% of any additional revenue would go 'straight down

to EBITDA'" (Dec., at 7-8 (quoting NeJame at CH Tr., at 103 – 04).))

**Figure 2**

| | '04-Q1 | '04-Q2 | '04-Q3 | '04-Q4 | '05-Q1 | '05-Q2 | '05-Q3 | '05-Q4 | '06-Q1 | '06-Q2 | '06-Q3 | '06-Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quarter over Quarter Revenue growth % (actual) | | 9.2% | 14.5% | 14.3% | 13.0% | 13.3% | 9.2% | 14.4% | -3.8% | 18.6% | 11.5% | -2.4% |

*11.* Trico makes several claims regarding evidence and the Bankruptcy Court's conclu-

9

sions relating to Trico's solvency.[1]  But their claims presuppose that Plaintiffs must prove that Trico was solvent to prevail.  This trial was *not* about whether or not Trico was solvent.  It was about Turbidy misleading the Bankruptcy Court and omitting material information and that Turbidy was aware that he misled the Bankruptcy Court.  The relevance of *solvency*, here, is to show that Turbidy's omissions were *material*.

**12.** Trico argues that Plaintiffs "cite a monthly report that only has preliminary numbers" to support the fact that Trico's Interest Expense for 2004 Q4 was only $7.6 million, as described by the Bankruptcy Court.  (Trico Br., at 21, n.11.)  The identical Interest Expense in PX 12 is confirmed in PX 40, reporting final results for 2004 Q4.  (See PX 40 (listing 2004 Q4 Interest Expense as $7.593 million).)

**13.** Trico also argues that $9 million of Interest Expense is the relevant comparison because Mr. Turbidy "remembered the quarterly interest expense to be approximately $9 million." (Trico Br., at 22, n.11.)  Mr. Turbidy was Trico's CFO and he was responsible for Trico's financial statements, which he signed.  He testified that he carefully focused on cash flow.  (See Trial tr. at 44.)  Mr. Turbidy knew or should have known that Interest Expense was no more than approximately $8 million, and not loosely round it up to $9 million, without making a disclosure as to the context of his testimony.

But more important is not the comparison of the 2004 Q4 EBITDA (whether adjusted for the unusually large special charges or not), as opposed to the $7.6 million interest expense (or even under Defendants' argument that Mr. Turbidy had the flexibility as an officer of the court to make loose assumptions about the magnitude of Trico's Interest Expense and import such as-

---

[1] These claims include the significance of one-quarter's performance (Trico Br., at 20), and Mr. NeJame's statements regarding Trico's prospects (Trico Br., at 8, and 20).

sumptions into the context of his testimony without disclosing his veiled context). The important comparison is what did the 2004 Q4 revenue and other financial performance statistics, for which Mr. Turbidy omitted and misled the Bankruptcy Court, indicate about Trico's *prospective* EBITDA and Trico's ability to meet its Interest Expense going forward. Interest Expense was approximately $8 million per quarter – not $9 million – and was not changing very much because most of Trico's debt was at a fixed rate (the Senior Notes). But Trico's revenue and EBITDA and EBITDA generating capacity were growing "dramatically." As of the Confirmation Hearing, EBITDA was already exceeding Trico's Interest Expense. (See Figures 1 and 2, and related citations.) Turbidy's omissions were undoubtedly material and his testimony was false and misleading.

*14.* Trico argues that "the Bankruptcy Court properly found that Appellants failed to present evidence that the $1.5 million Inventory Reserve was not included in Trico's Q4 2004 projections [and that] Mr. Turbidy testified that, to his knowledge, only the UK pension expense was not considered in the projections." (Trico Br., at 22, n.11.) Such finding was clearly erroneous. Internal Trico documents indicate that all three of the unusually large special charges, including the $1.5 million inventory reserve, were not included in the model. (See PX 9 at TRM10835 ("Operating expenses were dramatically higher than the model due to special charges for [the $2.7 million UK pension charge, the $.7 million redundancy reserve, and the $1.5 million inventory reserve]"), 836 and 838.) And, Mr. Turbidy did *not* testify "that, to his knowledge, only the UK pension expense was not considered in the projections." He testified that he had prepared the projections with a team that he had headed. (CH at 123:13-17.) Mr. Turbidy knew, or should have known, that the $1.5 million Inventory Reserve and the $.7 million Redundancy Reserve were not included in the projections. Thus, even if he did testify regarding Trico's 2004 Q4 actual EBITDA, as compared to the projections, he was not making an

11

"apples to apples" comparison – and he had to have known it.  And, to have said the comparison was "fairly consistent," knowing that EBITDA was only one-third higher than the projections, instead of two and one-half times higher than the projections, because the special charges would reduce EBITDA but were not considered in the projections, Turbidy was simply misleading the Bankruptcy Court by not disclosing the context of his testimony and the omitted information. The same is true regarding the "slightly higher" and "not materially" higher statements.

**15.** Trico also says that the Bankruptcy Court "did not ignore the Inventory Reserve or the $0.7 million Redundancy Reserve in its analysis[, but] did not view the [Inventory Reserve] as material in light of Trico's dire financial condition" (Trico Br., at 22, n.11.)  Such logic lacks judgment.  Treating the omitted information, such as an individual "special charge" as immaterial, when collectively all of the "special charges" and/or all of the omitted information were material, is a complete collapse in judgment.  Here, omitted information would *not* be material *only if* such information, when added to existing available information and all other omitted information, should lead a decision maker to believe with at least almost certainty that Trico would not be solvent as of the Effective Date.

**16.** Trico argues that "Mr. Turbidy was not even aware of the Redundancy Reserve at the Confirmation Hearing."  (Trico Br., at 22, n.11.)  But, to the extent that Mr. Turbidy did not know about (or how much) any of the "special charges," having known that actual revenue was approximately $8 million more than projected revenue, he would have thought that EBITDA would have been that much higher.  It is obvious that Mr. Turbidy misled the Bankruptcy Court and knew that he was being misleading.

**17.** Trico had very high operating leverage with very high fixed costs.  "[B]ecause a large component of Trico's operating costs were fixed, between 70% and 80% of any additional revenue would go 'straight down to EBITDA.'"  (Dec. at 7-8 (quoting CH at 103-04.).) Consequent-

ly, any error in revenue projection would "make a big difference in the EBITDA bottom line." (CH at 104.)  (Dec., at 7-8.)  Such financial operating profile is the very essence of a company where revenue is the primary driver of EBITDA and cash flow.  Trico was a company obsessed with revenue.  (See, i.e., PX 13, generally (monthly Flash Reports, describing monthly current revenue, and current projected), and 48 at 23 and generally at 1, 2, 8, 10-12, 16-17, and 21-24 (discussing and describing Trico's Day Rates, Utilization Rates, and Average Number of Vessels – the three categories of components of Trico's revenue).)  It is incredible that the Bankruptcy Court believed Turbidy's testimony that he was not "focused on revenue."  (Trico Br., at 8-9.) Certainly, an approximately one-third difference in actual revenue over projected revenue was a material omission by Turbidy.

## C.     Proof of Fraud and the Scienter Issue

Trico insists that Plaintiffs have not shown that Turbidy intended to deceive the court.  As Plaintiffs showed in the opening brief, they more than adequately established that under the circumstances of what Mr. Turbidy knew when he testified, knowledge that Trico agrees he had, Plaintiffs sufficiently established Mr. Turbidy's intent to deceive.

But it is doubtful whether such an intent is required.  Proof of "fraud" under 11 U.S.C. § 1144 is distinct from, and more straightforward than, proof of "fraud on the court."  While this fraud occurred in the courtroom, under section 1144 it is not necessary that "fraud on the court" occurred.  It is enough that the order of confirmation was procured by fraud.  11 U.S.C. § 1144. The Bankruptcy Court decided the claim under section 1144 based on an application of New York law, although other courts deciding such did not apply local law.  Under either standard, the Bankruptcy Court was wrong in its decision.

### 1.   Fraud Under New York Law

In New York, proof of "fraud" is satisfied by either of two similar standards: actual fraud

13

and constructive fraud.  Plaintiffs have shown, for purposes of this bifurcated trial, that both standards are satisfied.

### 2.  **Constructive Fraud, Applying New York Law**

Constructive fraud is where "there was a breach of any legal or equitable duty . . . even if there was no actual dishonesty of purpose."  *Pitcher v Sutton*, 238 A.D. 291, 292-93, 264 N.Y.S.2d 488 (4th Dep't 1933), *aff'd,* 264 N.Y. 638 (1934); *see also Costello v. Costello*, 209 N.Y. 252, 258, 259 (1913).

> Constructive fraud may be defined as a breach of a duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to dece- ive, to violate a confidence or to injure public or private interests which the law deems worthy of special protection *(Southern Inds. v Jeremias*, 66 AD2d 178, 182). The elements of a cause of action to recover for constructive fraud are the same as those to recover for actual fraud with the crucial exception that the ele- ment of *scienter* upon the part of the defendant, his knowledge of the falsity of his representation, is dropped *(Manheim Dairy Co. v Little Falls Nat. Bank*, 54 NYS2d 345, 349; *Pitcher v Sutton*, 238 App Div 291, 293, *affd* 264 NY 638) and is replaced by a requirement that the plaintiff prove the existence of a fiduciary or confidential relationship warranting the trusting party to repose his confidence in the defendant and therefore to relax the care and vigilance he would ordinarily exercise in the circumstances *(Collins v Nelson*, 193 Wash 334; see 37 CJS, Fraud, § 35).

*Abbate v. Abbate*, 82 A.D.2d 368, 378, 441 N.Y.S.2d 506 (2d Dep't 1981).

Here, Plaintiffs showed that Mr. Turbidy owed a fiduciary duty to the Bankruptcy Court when he testified, as an officer of the court, in procuring the confirmation order through fraud. Mr. Turbidy, as an officer of Trico, and Trico also owed a fiduciary duty to the Trico sharehold- ers.  It is not necessary, then, to establish scienter, since the Bankruptcy Court and the sharehold- ers, including Mr. Salsberg, trusted that Mr. Turbidy was upholding his fiduciary duty when he testified.  *See also* 11 U.S.C. § 1129 (requiring that to confirm a Plan, that it be "proposed in good faith and not by any means forbidden by law) and §1125 (all "adequate information" must be disclosed).

Additionally, Mr. Turbidy stood to substantially benefit financially by the fraud.  (*See*

14

Amended Proposed Finding of Facts, at 17-21, ¶¶ 83-112.)

### 3. **Actual Fraud, Applying New York Law**

The Bankruptcy Court distorted the elements of a fraud claim under New York law and expanded the meaning of "offered to deceive."  (Decision at 14 (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001), and *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y. 112, 302 N.Y.S.2d 799, 250 N.E.2d 214, 217 (N.Y. 1969))), by incorrectly interpreting it as "intent to deceive."  (Decision at 2, 10, 12, 18 n.9, and 20.)

In *Suez Equity Investors*, an allegation of common law fraud was upheld based on an averment that the defendant had committed "conscious misbehavior or recklessness."  250 F.3d at 100.  Here, Mr. Turbidy committed both.  He knew, or had to have known, that the omitted information was material and he had a fiduciary duty to disclose such material information.  He knew that the undisclosed revenue information was in play.  He specifically had been asked for such information.  *See also Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y. at 121 (a finding that "defendants knew, or should have known" that the representation was inconsistent with the defendant's representations, indicated a finding of scienter).

The Second Circuit confirmed the same formulation, quoting the *Jo Ann Homes* standard, for fraud in *Franco-Hellenique de Commerce v. Christophides*, 106 F.3d 22, 25 (2d Cir. 1997), and cited *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 122, 629 N.Y.S.2d 1009, 1014, 653 N.E.2d 1179, 1184 (1995) ("A cause of action for fraud may arise when one misrepresents a material fact, knowing it is false, which another relies on to its injury"), and RESTATEMENT (SECOND) OF TORTS §§ 525-526, 531 (1976).  Section 531 of that Restatement reads, "One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends *or has reason to expect to act or to refrain from action* in reliance upon the misrepresentation."  (Emphasis added).

Mr. Turbidy's testimony was false, or at a minimum in circumstances unreasonably stretched in his favor, his testimony was slanted.

By virtue of the fact that Mr. Turbidy was testifying – and he even said "that the purpose of the hearing was to determine the valuation of Trico" – he knew that anything that he said (and didn't say) would, or could, be relied upon in determining whether Trico was solvent (the valuation issue) and whether to confirm the Plan. (Decision at 16; Trial Tr. at 97.)

Mr. Turbidy owed the Bankruptcy Court and all Trico interest holders a fiduciary duty and a duty of care, which meant full disclosure of anything material and not to provide misleading testimony through omission. The breach of duties was a conscious act – he knew about the omissions and he knew the purpose of his testimony. Deception and reliance is an obvious consequence of Turbidy's conscious omissions and slanted testimony. *See Wyle v. R.J. Reynolds Indus.*, 709 F.2d 585, 590 (9th Cir. 1983) (upholding dismissal for fraud in prosecuting a claim and noting that attorneys' deliberate ignorance constituted equivalent of knowledge of the truth) (citing *United States v. Nicholson*, 677 F.2d 706, 710-11 (9th Cir. 1982) ("one who is aware of a high probability of the existence of a fact, but deliberately ignores the fact, is deemed to have knowledge of the fact")).

Mr. Turbidy "was conscious of an insufficient factual basis for his representations" and "that the evidence gave rise to an inference of such conscious disregard for the truth, and that this inference was of sufficient strength to satisfy [the plaintiffs'] burden of proof on its fraud claim." *Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.*, 569 F.2d 181, 186 (2d Cir. 1977) (overruling the finding of fact that scienter had not been found).

### 4.  <u>Fraud Applying Federal Law Under 11 U.S.C. § 1144</u>

Under Sections 1125 and 1129 of the Bankruptcy Code, all "adequate information" (as defined in the former) must be disclosed. Trico had a duty to disclose the omitted information

16

because "a plan proponent's duty to comply with the disclosure requirements of § 1125[,] a plan proponent's duty to propose a plan in good faith[,] and the fiduciary duty of a debtor in possession." *In re Tenn-Fla Partners*, 226 F.3d 746, 749 (6th Cir. 2000) (quoting *In re Tenn-Fla Partners*, 229 B.R. 720, 726 (W.D. Tenn. 1999)). Neither Trico nor Turbidy disclosed the 2004 Q4 revenue information (and the January 2005 revenue information from the January 2005 Flash Report), (*see* PX 13 at TRM10782 and 784) and the unusually large special charges, that were then available. (Trial Tr., at 71 lines 5-18; see also PX 9, at TRM10835 under the heading "EBITDA Variance from the Model" (indicating that "[o]perating expenses were dramatically higher than the model due to special charges for the UK pension plan ($2.7 million), an adjustment to the redundancy (severance) reserve in the UK ($0.7 million) and an inventory reserve ($1.5 million)".) Mr. Turbidy even was asked about such information. Mr. Turbidy also provided a tricky, if not wily and duplicitous, answer that had the effect of disarming the premise of Mr. Salsberg (the questioner) that revenue appeared to be growing much faster than forecasted and that, therefore, "their forecasts are far too conservative to be reasonable." (CH at 120; see also CH at 121-23.) "[A] confirmation order can only issue if its proponent demonstrates to the court that the requirements of § 1129 have been met." *In re Tenn-Fla Partners*, 226 F.3d 746, 751 (6th Cir. 2000).

*Tenn-Fla Partners* applied the following standard for fraud under section 1144:

(1) that the debtor made a representation regarding . . . compliance with Code § [1129] which was materially false;

(2) that the representation was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth;

(3) that the representation was made to induce the court to rely upon it;

(4) [that] the court did rely upon it; and

(5) that as a consequence of such reliance, the court entered the confirma-

17

tion order.

*In re Tenn-Fla Partners*, 226 F.3d at 750 (citations omitted).

The information omitted by Mr. Turbidy was material in that, taken along with all other available information, it would have (1) implied at least a reasonable likelihood that Trico was solvent, and (2) it would have rendered the Lazard/NeJame valuation and testimony to be suspect.  Turbidy knew that the actual revenue was approximately one-third higher than the projections, (*see* PX 13 at TRM10782 and 784; compare to Trial Tr, at 40:23 through 41:14), and that revenue was "dramatically higher than the projections"; and the effect of the unusually large special charges – the revenue alone was sufficient.  The omissions were "the type of thing that should have been mentioned in the same breath as what the EBITDA was for the fourth quarter." (Trial Tr., at 75.)  Contrary to Trico's mischaracterization, Turbidy knew how much the projections were and that these special charges were not a part of the projections.

The representation must be "either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth."  *In re Tenn-Fla Partners* at 750.  This testimony occurred at a confirmation hearing; it (and the omissions) is obviously "made to induce the court to rely upon it."  *Id.*

### 5.  **Fraud on the Court and FRCP 60(b)**

The standard for proving fraud on the court has distinctions, compared to fraud, as it should be applied to a claim under 11 U.S.C. § 1144, and it is distinct as applied by the Bankruptcy Court.

First, by making a claim for fraud on the court, Plaintiffs invoked Fed. R. Civ. P. 60(b).  In addition to fraud on the court, rule 60(b) includes relief from "fraud . . ., misrepresentation, or other misconduct," for which the burden requirements are lower.  Fed. R. Civ. P. 60(b) also preserves the claim for fraud on the court for cases that do not meet the one-year limitation require-

ment for other Fed. R. Civ. P. 60(b) claims. Here, Plaintiffs filed within the 180-day limitation requirement of 11 U.S.C. § 1144, and thus met the one-year limitation under Fed. R. Civ. P. 60(b). Thus, Plaintiffs are entitled to relief, notwithstanding the more challenging standards for fraud on the court. At the Confirmation Hearing, Mr. Salsberg asked Mr. Turbidy, Trico's CFO, how much was the 2004 Q4 revenue. He refused and Trico objected to him answering. The information was not provided at the Confirmation Hearing, and instead, misleading information was provided. Mr. Salsberg and the Court were entitled to full disclosure, which Mr. Turbidy and Trico failed to provide. Mr. Salsberg was thus denied an opportunity to adequately put on his case. Here, at a minimum, Turbidy misrepresented Trico's 2004 Q4 performance and its prospects when he testified as he did while omitting other crucial facts. Had Mr. Salsberg and the Court been aware of the omitted information, including the requested information, it would have become apparent (and Mr. Salsberg would have had an opportunity to prove) that Trico had not met its obligations under 11 USC § 1129 to obtain approval of its Plan. By misleading the Court and by misleading Salsberg at the Confirmation Hearing, in part through omission, Turbidy prevented Salsberg from fairly putting on his case at the Confirmation Hearing. Plaintiffs are entitled to relief under Fed. R. Civ. P. 60(b).

Second, Plaintiffs have also met the higher burden imposed by fraud on the court under Fed. R. Civ. P. 60(b). (This higher burden for fraud on the court may be a lower burden in certain limited respects than the standard for fraud under 11 U.S.C. § 1144, depending upon how fraud is applied in any given jurisdiction.) The circuits appear to be split as to whether intent or reckless disregard for the truth is sufficient to a finding of fraud on the court. The Sixth Circuit position is that "a scheme, based on a subjective intent to commit fraud, is not required" for a finding of fraud on the court, because "[r]eckless disregard for the truth is sufficient." *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993). The Tenth Circuit holds that "'fraud on the

court' . . . requires a showing that one has acted with an intent to deceive or defraud the court." *Robinson v. Audi Aktiengesellschaft*, 56 F.3d 1259, 1267 (10th Cir. 1995). Courts in other circuits have found that reckless disregard for the truth is sufficient for a finding of fraud on the court. A commonly cited case under 11 U.S.C. § 1144 in the Ninth Circuit carefully analyzed fraud under 11 U.S.C. § 1144 as fraud on the court and found that "[t]he officer of the court must have fraudulent intent, which connotes either knowledge, including reckless disregard, of falsity or intentional omission of material information." *In re Michelson*, 141 B.R. 715, 726 (Bankr. E.D. Cal. 1992). A similar analysis was followed in *Tenn-Fla Partners v. First Union National Bank* (*In re Tenn-Fla Partners*), 229 B.R. 720 (W.D. Tenn 1999), *aff'd*, 226 F.3d 746 (6th Cir. 2000). Several circuits have held that recklessness is sufficient for a finding of fraud on the court in obtaining a patent (also referred to as fraud on the patent office), and for dismissing an indictment after conviction. For example, as to the latter, "the prosecutor's conduct [must] amount[] to a knowing or reckless misleading of the grand jury as to an essential fact." *United States v Lombardozzi,* 491 F.3d 61, 79 (2d Cir. 2007) (citations omitted).

Several courts have held that fraud on the court is "that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) (quoting 7 MOORE'S FEDERAL PRACTICE ¶ 60.33, at 515 (1971 ed.)). Accordingly, there are two paths to fraud on the court: One occurs when the fraud is perpetrated by anyone, and, generally has certain higher requirements than the other path, which occurs when an officer of the court perpetrates the fraud. It seems that, at least regarding the latter case (involving an officer of the court), recklessness should be sufficient to create fraud on the court. An officer of the court owes a fiduciary duty and a duty of care – thus, there must be some stan-

dard of care that a court *demands* from its officers.  Everyone is obligated not to commit fraud (which probably occurs when there is recklessness), but an officer of the court must function at a higher level – thus, recklessness must be sufficient when an officer of the court perpetrates the fraud.

In a related context, in a securities fraud case, recklessness "generally satisfy[ies] the scienter requirement."  *Oleck v. Fischer*, 623 F.2d 791, 794 (2d Cir. 1980) (quoting *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1306 (2d Cir. 1973) (en banc)).  "Certain cases have suggested that the sufficiency of reckless conduct may turn on the existence of a fiduciary duty or duty to disclose."  *Id.* (citation omitted).  Thus, at least in the securities law context, the appropriateness of "recklessness" as a standard for fraud is heightened when there is a fiduciary duty.  The Court should demand a heightened duty of care and responsibility from its officers.

**D.    The fraud here was "severe"**

Trico seeks to minimize the import of Mr. Turbidy's false statement.  (Trico Br., at 26-27.)  As shown throughout this Brief, however, it is clear that his testimony went to the heart of the issue before the Bankruptcy Court, i.e., was Trico solvent.  Had he testified truthfully about Trico's actual fourth quarter performance, this likely would have – although this was not an issue at this trial – established that Trico's prospects were not as they were projected to be in the Disclosure Statement and that the Plan of Reorganization should not have been approved.

**E.    Plaintiffs are not raising a new issue**

Trico contends that Plaintiffs are raising the issue of whether Mr. Turbidy had a duty to disclose information about the fourth quarter for the first time on this appeal, although it doesn't say what particular information is being referred to.  (Trico Br., at 22.)  In fact, Plaintiff asserted before the bankruptcy court that because of the questions that Mr. Turbidy was asked at the Confirmation Hearing, his failure to disclose additional information made the answers he gave to

those questions – if they were themselves true – was an actionable omission because the failure rendered what he did say misleading.  (Pl. Reply Concl. Of Law, at 8.)

Nor was this information "irrelevant to the plan."  (Trico Br., at 23.)  As noted above, this went to the heart of whether the Plan should have been confirmed.

Nor is this an attempt to challenge the accuracy of the Disclosure Statement.  (Trico Br., at 24-25.)  Plaintiffs do not challenge that.  It was accurate as far as it went.  The problem was that Mr. Turbidy's testimony endorsed the contents of the Disclosure Statement insofar as they concerned Trico's fourth quarter performance.  In other words, when the Bankruptcy Court rejected objections to the Disclosure Statement, it did so when it understood (based upon Mr. Turbidy's testimony) that its contents were still valid, i.e., that the fourth quarter projections were still reasonably accurate and the following projections, which naturally followed what happened in the fourth quarter, were still viable.

## F.     Mr. Salsberg did not have an opportunity to uncover the fraud

The contrast with *In re California Litfunding*, 360 B.R. 310 (Bankr. C.D. Cal. 2007), on which Trico relies, is telling.  There, the alleged misrepresentation was made in the disclosure statement, as opposed to at the Confirmation Hearing itself, as in this case.  There, the fraud was made months before the confirmation, as opposed to being at the hearing in a pre-packaged bankruptcy filed shortly before the hearing.  There, the court said that the creditor could have brought the claim had it done so within six months of the confirmation (an observation made in the sentence immediately after the one quoted by Trico, (Trico Br., at 28)), which is precisely what Plaintiffs have done here.  360 B.R. at 318-19.

Fraud on the court is "that species of fraud which does or attempts to, defile the court itself, *or* is a fraud perpetrated by officers of the court."  (Kupferman v. Consolidated Research & Mfg. Corp., 459 F.2d 1072, 1078 (2 Cir. 1972) (citing 7 Moore, Federal Practice para. 60.33 at

511 (1971 ed.)); see also Defendants Br at 31.)  (Emphasis added.)  Thus, there are two alterna-

tive paths to fraud on the court.  The former relates to anyone defiling the court.  The latter refers

to an officer of the court perpetrating the fraud.  The requirement of no opportunity to uncover

the fraud pertains to the former path and *not* to the latter path where an officer of the court has

perpetrated the fraud, and who owes a fiduciary duty to the court.  The court relies on the per-

formance of such duty to maintain the integrity, the effectiveness, and the efficiency of the

process.  Here, Mr. Turbidy was an officer of the court when he testified.  There is no require-

ment that Plaintiffs show that there was no opportunity to uncover the fraud.

**G.    Plaintiffs' Complaint Sufficiently Alleged that an Officer of the Court Committed the Fraud**

Plaintiffs alleged everything necessary for the Bankruptcy Court to know that Mr. Turbi-

dy was an officer of the Court when he testified at the Confirmation Hearing on January 19,

2005.  Plaintiffs alleged that Mr. Turbidy committed the fraud, and that he was the CFO of Trico,

the Debtor.  Trico had already been on record with the Bankruptcy Court as a Debtor in Posses-

sion, thus, it and its officers were officers of the court.  Plaintiffs also asked the Bankruptcy

Court that if it did "not believe that Plaintiffs' proposed pleadings sufficiently allege[d] that an

officer of the Court committed the fraud, [to be permitted] to amend their pleadings to satisfy

such requirement."  (Plaintiffs Memorandum of Law in Support of Motion for Reargument (De-

cember 4, 2006), at 2.)

During argument on the motion, Plaintiff Salsberg said, in referring to Mr. Turbidy testi-

fying at the Confirmation Hearing as Trico's CFO, "when the debtor is sitting up in that box he

does have a duty to disclose,"  (Hearing Re Motion to Amend Complaint, August 10, 2006, at

42.) and argued that Trico's (and thus Turbidy's) duty arose because Trico "as debtor in posses-

sion [was] an officer of the court." (Id.)[2]

In addition to the several authorities supporting the conclusion that Mr. Turbidy testified as an officer of the court, (Appellants' Opening Brief, 41 – 44) authority in this district does exist "for the proposition that officers of debtors-in-possession are officers of the court." (See Aug. 23, 2007 Decision ("Dec.") at 19.)

## H.    This is not a case where the Court needs to be concerned about "Redividing the Pie"

Trico argues that the claim should not be allowed because it would result in a de facto "redivision of the pie" that the Plan has already divided, with the result that parts that went to certain claimants in the Plan will be diverted to Plaintiffs which would defeat the whole purpose of the approval of, and finality afforded by, the Plan in the first place. (Trico Br., at 29.) The cases on which Trico relies were chiefly efforts to bring a claim after the 180-window for bringing a revocation claim has closed, and the courts have held that one cannot do indirectly what she is barred from doing directly. This was the conclusion in *In re Genesis Health Ventures, Inc.*, where the claim was dismissed because it was filed after the 180-day period had passed. 324 B.R. 510, 516-17 (Bankr. D. Del. 2005), *aff'd*, 340 B.R. 729 (D. Del. 2006).

In *Hotel Corporation of the South v. Rampart 920, Inc.*, the Eastern District of Louisiana similarly held that section 1144 "places a limit on the period of time within which a party may attack a bankruptcy plan on the ground that it was procured by fraud. To allow Plaintiffs to collaterally attack the Bankruptcy reorganization on grounds of fraud is to allow them to do indirectly what they no longer may do directly because of 11 U.S.C. § 1144." 46 B.R. 758, 770-71 (E.D.

---

[2] This transcript had numerous typographical errors. The cases depicted in the transcript as (1) "Nicholson" and (2) "Tenth Law" were actually (1) *Official Committee of Unsecured Creditors* v. H.B. *Michelson* (In re H.B. *Michelson*), 141 B.R. 715, 723 (Bankr.E.D.Cal.1992), and (2) *Tenn-Fla Partners v. First Union National Bank* (*In re Tenn-Fla Partners*), 226 F.3d 746 (6th Cir. 2000), respectively.

La. 1985), *aff'd w/o op.*, 781 F.2d 901 (5th Cir. 1986).  And as Judge Platt noted in *In re Coffee Cupboard*, this was the conclusion of the First Circuit in *In re Newport Harbor Assocs.*, in which it found that the hard-date of what was then six months could not be gotten around by reference to equitable tolling.  589 F.2d 20, 23-24 (1st Cir. 1978) (considering six-month period of section 1144 predecessor, section 386 of the Bankruptcy Act, 11 U.S.C. § 786 (1976)), *noted at In re Coffee Cupboard*, 119 B.R. 14, 19 (E.D.N.Y. 1990).  *In re California Litfunding*, too, is a case in which the fraud action was brought after the passage of 180 days, the permitted period under section 1144, 360 B.R. at 321, as was *In re Emmer Bros. Co.*, 52 B.R. 385, 392 (D. Minn. 1985).

Here, of course, the bankruptcy court determined that a *timely* 1144 claim to revoke could not proceed under principles of equitable mootness with the attendant disruptions that would flow from revocation.  Where a claimant is not seeking to revoke a plan, including (as here) because a court has found the attempt moot, she may assert a claim for fraud.  This Court described such a case in *In re The Circle K Corp.*

> Following the Committee's unsuccessful direct challenge to the confirmation order, the plaintiffs commenced this adversary proceeding in the Arizona bankruptcy court to revoke the confirmation order under 11 U.S.C. § 1144. The plaintiffs, who owned debentures wiped out under the plan, charged that the defendants had fraudulently procured the confirmation order.  The defendants, they argued, concealed the right of Circle K's management to purchase equity in New Circle K, and falsely represented the post-confirmation ownership of the debtor as well as the value of the debtor in the confirmation process.  [*Phelps & Co. v. Circle K Corp.* (*In re Circle K Corp.*)] *Circle K I*, 171 B.R. [666] at 667-68 [(Bankr. D. Ariz. 1994)].  Chief Judge Nielsen dismissed the complaint as moot, ruling that the plan had advanced to the point that he could not fashion effective relief even if the plaintiffs prevailed.  *Id.* at 670.

> The plaintiffs then filed an amended complaint which relied upon the same allegations, but sought damages and equitable relief instead of revocation.  The defendants again moved to dismiss the complaint, or in the alternative, for summary judgment.  This time, however, the court denied the motions, drawing a distinction between a confirmation revocation claim which seeks "to redivide the pie" and a damage action based upon confirmation fraud which aims to increase the pie.  *S.N. Phelps & Co. v. Circle K Corp.* (*In re Circle K Corp.*), 181 B.R. 457, 462 (Bankr. D. Ariz. 1995).

*In re the Circle K Corp.*, 1996 WL 529399, at *1-2 (Bankr. S.D.N.Y. June 11, 1996) (consider-ing objections to subpoenae served in Southern District of New York) (footnote omitted).

In *In re Circle K*, the court in Arizona concluded that "If plaintiffs prevail, the Court can fashion a remedy that does not upset the confirmed plan, i.e., monetary damages." *S.N. Phelps & Co. v. Circle K Corp.* (*In re Circle K Corp.*), 181 B.R. 457, 462 (Bankr. D. Ariz. 1995).

**I.      Trico and the Bankruptcy Court made numerous errors with respect to valuation**

Both the Bankruptcy Court and Trico claim that Trico was "hopelessly insolvent" as of the CH, with negative equity of $240 million so that what Mr. Turbidy said did not matter.  (Tri-co Br., at 10, 16, 19, and 20; Dec., at 9; CH Tr. at 137:3.)  Trico says that Plaintiffs' assertion that Trico had $164 million in negative equity "ignore[d] all of Trico's debt obligations beyond Trico's Senior Notes."  (Trico Br., at 20-21, and n.10.)

Plaintiffs explained briefly in their opening brief the basis for this.  (Pl. Br., at 24-25.)  This is important because the Bankruptcy Court's conclusion that, according to Lazard and Ne-Jame, Trico had "$240 million of negative equity" influenced its conclusions that Trico was "hopelessly insolvent," that Turbidy's omissions were not material, and that Mr. Turbidy's ratio-nalizations regarding his testimony were reasonable and believable.  In other words, the Bank-ruptcy Court found that the actual fourth quarter results were not material to Trico's overall fi-nancial condition and that Mr. Turbidy's testimony (if that's what it was) was thus correct.  This was a critical error.  The actual fourth quarter performance figures of which Mr. Turbidy was aware meant that Trico was probably solvent and that Mr. Turbidy's rationalization was false.

On valuation, the only impaired class, the Senior Notes, totaled $274.8 million ($250 mil-lion + $24.8 million in arrears).  (*See* Pl. Br., at 24 and the references therein.)  These Notes were to be exchanged for New C/S, valued by Lazard/NeJames at $110 million.  All other debt – all unimpaired – was subsumed into the Lazard/NeJame valuation and was a part of the $110 mil-

lion of value that Lazard and NeJame ascribed to the New C/S.  Accounting for all of Trico's debt, then, gave a negative value to Trico, according to the Lazard/NeJame opinion, of $164.8 million (i.e., $274.8MM – $110MM).

The following explains how Lazard treated the debt that Trico thinks Plaintiffs ignored and how the Bankruptcy Court made such a blunder, and to reconcile its blunder with the actual Lazard opinion.  The Bankruptcy Court and Trico confused "equity" from an accounting perspective with "equity" from a financial valuation perspective.  The accurate explanation of Trico's "negative equity," as opined by Lazard and Mr. NeJame, was described in Appellants' (Pl. Br., at 24-25.)  The Lazard/NeJame Enterprise Valuation subsumed all debt, except for the $274.8 million of debt subject to compromise, and made an adjustment for excess cash.  The Court effectively double counted some of such debt-related items.

The Bankruptcy Court, however, subtracted $235.2 million (the midpoint of Lazard's estimate of Distributable Value, (*see* DS at I-43, Part VIII.D.1)), from Trico's Estimated Pre-Reorganization Total Liabilities of $472.4 million to get $237.2 million.  But because the Lazard/NeJame valuation subsumed some of Trico's pre-reorganization debt and excluded some excess cash that Lazard excluded from its estimate of Distributable Value, and it was incorrect.[3]

---

[3] The $472.4 million in Total Liabilities in the Pro Forma Projected B/S includes items that were not impaired, were considered in the Lazard valuation, and/or were kept on the books in the post-reorganized projected balance sheet. (See DS, Exhibit C, at 5, and compare the first column of numbers ("Estimated Pre-Reorganization Balance Sheet") to the fourth column of numbers ("Pro Forma Reorganized Balance Sheet").  (Also note, the Pro Forma Reorganized Balance Sheet is equivalent to Projected Balance Sheet (Unaudited) ("Projected B/S") (DS, Exhibit C, at 8, under FYE December 31, 2004.).)

In comparison, when Lazard subtracted Trico's December 31, 2004 debt balance, net of cash, of $125.2 million from Trico's Distributable Value of $235.2 million to determine the value of the New C/S at $110 million, the net of cash debt balance of $125.2 million was determined by adding the Non-Current Liabilities (USD Term Loan/DIP Facility of $54.6 million and the Other Long-term Debt of $85.2 million) and then subtracting the Unrestricted Cash and Cash Equivalents of $14.6 million ($54.6 million + $85.2 million - $14.6 million = $125.2 million).  (*See* DS, at I-43, Part VIII.D.1., and Pro Forma Pro-
(Footnote continued . . .)

Such formulation by the Bankruptcy Court overestimated Lazard's view of Trico's "negative equity."

Lazard did not subtract certain subsumed debt items from the Distributable Value to determine the value of the New C/S. These were (1) Deferred Income Taxes of $37.2 million, (2) Other Liabilities of $2.1 million, and (3) Total Current Liabilities of $18.5 million.[4]  (See DS, Exhibit C, at 5.) The Bankruptcy Court effectively counted these debt items twice.

Lazard also excluded $14.6 million of excess cash from its estimate of Distributable Value of $235.2 million (midpoint), and instead offset such excess cash against debt to determine its estimate of the value of the New C/S.[5]  (See DS, at I-43, Part VIII.D.1.; see also DS, Exhibit C,

---

jected B/S, DS, Exhibit C, at 5, read together.)  Excluding the Senior Notes ($274.8 million) that were cancelled, all other debt items on Trico's balance sheet were subsumed in Lazard's $110 million valuation of Trico's New C/S.  Effectively, the Plan included the post-reorganized Trico assuming some of the debt of the pre-reorganized Trico, including debt items that were offset by other factors and imbedded into the Enterprise Value (and Distributable Value).   The Lazard valuation of $235.2 million, midpoint, Distributable Value includes some of the debt on the pre-reorganized Trico's balance sheet.  Thus, by subtracting Trico's Distributable Value of $235.2 million from Trico's pre-reorganization Total Liabilities, the Bankruptcy Court improperly subtracted a value that was burdened by the assumption of debt that was a functional aspect of Trico as a going concern, from the gross amount of debt.

[4] The Plan called for the reorganized Trico to assume each of these liabilities and all were accounted for by Lazard as an aspect of Trico as a going-concern.  (*See* Pro Forma Projected B/S, DS, Exhibit C, at 5, and compare Estimated Pre-Reorganization Balance Sheet (the first column of numbers) with Pro Forma Reorganized Balance Sheet (the fourth column of numbers).  The Lazard/NeJame valuation already had accounted such liabilities as a part of Trico's $235.2 million Distributable Value (midpoint) and $110 million New C/S value. The Deferred Income Taxes of $37.2 million was excluded because effectively they had no negative value, and, in fact, Lazard determined that income tax liability had positive value in terms of NOL carryforwards ($7.5 million positive net present value according to Lazard (DS, at I-46.))

Total Current Liabilities of $18.5 million were excluded by Lazard, and should have been excluded by the Bankruptcy Court, also because it is a part of Trico's *working capital*, which is more than offset by Trico's Total Current Assets of $52.9 million ($14.6 million of which Lazard subtracts from Non-Current Liabilities to determine the net of cash debt balance of $125.2 million).  (See DS, at I-43, Part VIII.D.1.)

[5] Lazard reduced Trico's Non-Current Liabilities by Trico's unrestricted cash balance in determining the value of the New C/S.  Such an approach was legitimate, but it may have confused the Court.  Perhaps a more explicative way of viewing it would have been to have included the $14.6 million in (Footnote continued . . .)

at 5.)  The Bankruptcy Court erred by not accounting for the excess cash.

Thus, the facts acknowledged by the Bankruptcy Court – that Trico's EBITDA (after reduction from the unusually large special charges) was approximately 1/3 higher than the projected EBITDA for the 2004 Q4 and Turbidy's failure to disclose the $2.7 million from the UK pension charge – alone are sufficient to at least challenge the outdated Lazard/NeJame valuation which determined that Trico had $164.8 million of "negative equity."  Add to that all of the other facts omitted by Turbidy and/or neglected by the Bankruptcy Court, it is obvious that Turbidy's omissions were material.

**J.    The Relevance and Merit of Plaintiff's Argument Regarding Trico's Net Operating Loss ("NOL") Valuation**

Trico questions the relevance of Plaintiffs' argument regarding Trico's Net Operating Loss carryforwards ("NOLs").  (See Trico Br., at 34.) Trico's NOLs are pertinent because, had Turbidy and Trico made full and complete disclosures, (1) Trico's value would have been determined to be higher than as determined by the Lazard/NeJame valuation, (2) such higher value would have been based on both a higher Enterprise Value and a higher NOL value (since the value of the NOLs were dependant on the total value of the New C/S), and (3) such higher value would have indicated that (contrary to the Bankruptcy Court's determination) (a) Trico was solvent, (b) Turbidy's omissions were material, and (c) Turbidy's rationalizations regarding his testimony were absurd.  (See *Id.*)

Plaintiffs' NOL analysis shows that the threshold of solvency was significantly less, in

---

excess cash in Trico's Distributable Value (as it did by including the value of the NOL carryforward tax attributes), which would have then been $249.8 million ($235.2 million mid-point value plus $14.6 million cash), and then subtracting the Non-Current Liabilities (without any reduction for cash) of $139.8 million, to arrive at the same $110 million of value for the New C/S.

terms of Enterprise Value (which excludes the value of the NOLs from the Distributable Value), (See DS at I-43, Part VIII.D.1.) than the "negative equity" of $164.8 million, as opined by Lazard, because the higher NOL value offsets some of the difference between the threshold of solvency and the Lazard valuation opinion.  (See DS at I-43, Part VIII.D.1.)

Defendants reference to the May 5, 2006 Order is irrelevant and its argument that the Section 382 "change of control"[6] limits Trico's NOL utilization does not alter Plaintiffs analysis. (See Trico Br., at 34-35.)  Plaintiffs' NOL analysis falls completely under the assumption that there was an "ownership change" and that Section 382 applies.  In fact, Plaintiffs' analysis is based on Section 382(l)(6) and alternatively 382(l)(5).  Indeed, the NOL utilization and valuation was explained in the Disclosure Statement, (DS, at 50-51, Part VII.B., I-43, Part VIII.D.1., I-44, Part VIII.D.1., I-45, Part VIII.D.2., I-46, Part VIII.D.2.b., and I-46, Part VIII.D.2.c.) including the general limitation (and the Section 382(l)(5) exception to that rule), which pegs the limitation to the "value of the stock."  (DS, at 50-51, Part VII.B., I-43, Part VIII.D.1., I-44, Part VIII.D.1., I-45, Part VIII.D.2., I-46, Part VIII.D.2.b., and I-46, Part VIII.D.2.c.)  Trico, and Mr. Turbidy as an officer of Trico, were responsible for this information when Mr. Turbidy's testified at the Confirmation Hearing.

---

[6] Section 382 does not use the term "change of control."  Section 382 uses the term "ownership change."  See 26 U.S.C. § 382(g).

## II.    CONCLUSION

For the foregoing reasons, and those set forth in Plaintiffs' opening brief, the judgment of

the Bankruptcy Court should be reversed.

Dated:  New York, New York
        January 24, 2008

STEVEN SALSBERG, *pro se*


By:  _____/S/_____
            Steven Salsberg
205 W. 88th Street, #2-D
New York, NY 10024
(212) 362-1367

LAW OFFICE OF JOSEPH P. GARLAND


By:  _____/S/_____
            Joseph P. Garland — JG0888
275 Madison Avenue, 11th Floor
New York, NY  10016
(212) 213-1812

Attorneys for Gloria Salsberg

31